UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT ELECTRONICALLY
FILED
DOC#: _____
DATE FILED: 9-28-17

ROSEANGEL RIVAS,

                              **Plaintiff,**

            -against-

NANCY A. BERRYHILL, *ACTING
COMMISSIONER OF SOCIAL SECURITY,*

                              **Defendant.**

**1:17-cv-05143 (ALC)**

<u>**OPINION AND ORDER**</u>

**ANDREW L. CARTER, JR., United States District Judge:**

Plaintiff Roseangel Rivas brings this action challenging the Commissioner of Social

Security's ("Commissioner" or "Defendant") final decision that Plaintiff was not entitled to

Supplemental Security Income ("SSI") under Title II of the Social Security Act. 42 U.S.C. §§

401-433. Currently pending are parties' cross motions for judgment on the pleadings pursuant to

Fed. R. Civ. P. 12(c). ECF Nos. 12; 16-17. The Court has considered parties' submissions and

for the reasons set forth below, Plaintiff's motion is **DENIED** and Defendant's motion is

**GRANTED**.

**BACKGROUND**

**I.      Procedural Background**

On November 4, 2013, Plaintiff applied for SSI in connection with disability allegedly

commencing on December 15, 2012. R. at 11.[1] The Social Security Administration ("SSA")

denied Plaintiff's claim on March 3, 2014. *Id.* As a result, Plaintiff filed a written request for a

social security hearing before an Administrative Law Judge ("ALJ") on April 4, 2014. *Id.*

---

[1] "R" refers to the Certified Administrative Record filed at ECF No. 11. Pagination follows original pagination in
the Certified Administrative Record.

ALJ Robert Gonzalez commenced the social security hearing on January 29, 2016. *Id.* at 34. Plaintiff, who was represented by counsel, appeared and testified in person. *Id.* at 26. The ALJ rendered his decision on March 8, 2016, finding that Plaintiff was not disabled under section 1614(a)(3)(A) of the Social Security Act. *Id.* at 21. Plaintiff then requested and was denied reconsideration by the SSA Appeals Council on May 9, 2017. *Id.* at 1-4.

Plaintiff brought this action on July 7, 2017. Compl., ECF No. 1. On December 20, 2017, Plaintiff moved for a judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c). Pl. Mot. J. Pleadings, ECF No. 12. Commissioner cross moved for judgment on the pleadings on February 20, 2018. Def.'s Cross Mot. J. Pleadings, ECF No. 15. The Court now considers parties' motions.

## II.    Non-Medical Evidence

### A.    Plaintiff's Background

Plaintiff was born on September 14, 1992. R. at 72. Plaintiff is 5'6" tall and weighs 290 pounds. *Id.* at 52. Plaintiff has a tenth grade education and attempted, but failed to complete a GED in 2014. *Id.* at 42. Plaintiff testified that in 2012 she worked as a cashier at Walmart on a part-time basis (i.e., 20-30 hours a week) for approximately four to five months. *Id.* at 47-48. At the time of the hearing, Plaintiff testified that she lived with her one-year-old daughter and her daughter's father. *Id.* at 46. Plaintiff and her child received support from both her child's father, who is employed full-time, and Plaintiff's grandmother. *Id.* at 45.

In her Work History Report dated December 29, 2013, Plaintiff reported she had problems getting along with others and worried that "someone is out to get her." *Id.* at 261-62. However, Plaintiff also reported that she enjoyed spending time with family watching TV, listening to music, and playing games. *Id.* Plaintiff denied having problems with authority

figures or ever losing a job on account of problems getting along with others. *Id.* at 263. Plaintiff reported being able to pay bills, count change, and handle a savings account. *Id.* at 260. She also reported being able to go out alone, including going to the store, and she traveled on foot, as a passenger in a car, and by public transportation. *Id.*

At the hearing, Plaintiff testified that her grandmother received SSI to take care of Plaintiff when she was a minor. *Id.* at 57. She also testified that her disabilities have changed and worsened since she was a minor. *Id.* Plaintiff testified that a typical day includes waking up and feeding the child, watching TV and having lunch after which the child naps for about an hour, during which Plaintiff watches her own TV programs. *Id.* at 49-51. Asked whether she is in charge of caring for her daughter, Plaintiff testified that even though she had help from her boyfriend's mother, her grandmother, and her cousins, she is able to take care of her daughter when they are not around. *Id.* at 46-47. Plaintiff testified that her only long trip since December 2012 was a visit to Boston to see her grandmother who was given two weeks to live. *Id.* at 55.

**B.    Plaintiff's Alleged Disability**

Plaintiff alleges that she suffers from Attention Deficit Hyperactivity Disorder ("ADHD"), bipolar disorder, anxiety disorder, depression, panic attacks, high blood pressure, menorrhagia[2], and asthma. *Id.* at 244. Plaintiff has a BMI of 47.75, which is considered morbid obesity. *Id.* at 681. Plaintiff reported that she used an "asthma machine" that was prescribed by a doctor in 2009, and that her medications include Adderall for ADHD, Klonopin for anxiety, Tramadol for sleep, and Zoloft for depression. *Id.* at 263-64. Plaintiff also testified that she used Lamictal for her bipolar disorder and Abilify for depression. *Id.* at 61.

---

[2] Menorrhagia refers to heavy menstrual bleeding.

3

At the hearing, Plaintiff testified that her unpredictable mood swings are her most severe problems because they negatively impact her relationships with her family and can impair her ability to take care of her child. *Id.* at 58. Plaintiff also explained that she was unable to maintain her position as a cashier at Walmart because she had panic attacks. *Id.* at 59. Plaintiff stated that her panic attacks were a result of "too many people" being around, namely "a lot of Jews" who "were just taking over." *Id.* Plaintiff also testified that her anxiety and panic attacks sometimes come on when she is in public with large groups of people. *Id.* at 51. If she has to go shopping, taking Xanax calms her down. *Id.* Plaintiff testified that one week prior to the hearing and after taking Xanax, she had a panic attack when she was in Walmart with family members. *Id.* at 60. She testified that her weight does not affect her ability to care for her daughter, but exacerbates her depression. *Id.* at 53.

## C. Medical evidence in the Record

Plaintiff received psychiatric treatment primarily at Synergy of Monticello, Inc. ("Synergy") and received general treatment at Hudson River Healthcare, Inc. ("HRHcare"). Before the hearing, Plaintiff self-referred for mental health evaluation at the Division of Health & Family Services of the Sullivan County Department of Community Services in anticipation of filing for disability. Relevant medical records are summarized below.

### i. Plaintiff's Medical Evidence before Alleged Disability Date

Since the record contains a significant amount of evidence occurring before Plaintiff's alleged disability onset date, this evidence is reviewed and considered only so far as it demonstrates the longitudinal history of Plaintiff's impairments and relates to Plaintiff's abilities and limitations during the period of alleged disability.

Plaintiff's first psychological evaluation in February 2001, when she was eight and a half years old, noted that she presented as over-reactive, was likely to become overwhelmed and disorganized, could lose touch with reality due to strong emotions, and diagnosed her with Attention Deficit Disorder and Adjustment Disorder with Mixed Emotional Features. *Id* at 480. In August 2006, when Plaintiff was thirteen, her cognitive and emotional functioning was evaluated. *Id*. at 494. Plaintiff's Full-Scale IQ was measured at 79, indicating cognitive functioning in low average to borderline range overall, and Plaintiff was diagnosed with ADHD and a Developmental Disorder. *Id*. In September 2007, when Plaintiff was fifteen, testing confirmed that her IQ did not improve and she still had ADHD. *Id* at 497. Plaintiff's student record in September 2011 noted highest grade completed was ninth grade and confirmed that she was in special education and learning disabled. *Id* at 473.The record also noted that Plaintiff was taking Singulair (an inhaler) for asthma and had high blood pressure. *Id*.

### ii. Plaintiff's Psychiatric Treatment after Alleged Disability Date

*Treating Nurse Practitioner Beth Barker*

Beth Barker, a nurse practitioner, treated Plaintiff at Synergy between April 2013 and October 2015. *See* R. at 352-385; 442; 517-522; 526-529; 535-538; 543-548; 551-553; 677-680. Throughout her treatment and evaluation with Barker, Plaintiff reported symptoms of varying intensity and frequency consistent with anxiety, panic attacks, ADHD, bipolar disorder, and depression. *Id*. During her mental status examinations, Plaintiff consistently exhibited clear and age-appropriate speech, cooperative and appropriate behavior, good eye contact, intact language processing, clear and appropriate thought processes, intact associative thinking, intact memory, judgement and insight, and normal attention span and concentration. *Id*.

During Plaintiff's initial visit with NP Barker on April 24, 2013, Plaintiff stated "I want to begin therapy again[,] and I think I need to go back on medication." *Id.* at 383. Upon examination, Plaintiff displayed anxiety and euthymic mood. *Id.* at 385. However, Barker deferred her assessments. *Id.* When Plaintiff visited Barker on May 23, 2013, Plaintiff stated "I don't feel any difference in the medication." *Id.* at 379. Barker noted that Plaintiff displayed anxiety periodically and euthymic mood consistently. *Id.* at 379. Barker's assessment was that Plaintiff's "[a]nxiety [was] improving. ADHD [was] ongoing. Mood swings [were] ongoing. Panic disorder [was] improving." *Id.* at 380.

On multiple occasions throughout Plaintiff's treatment, Barker stated that Plaintiff's conditions were improving. For example, after Plaintiff's treatment session on June 13, 2013, Barker's assessment was "anxiety is improving. ADHD is ongoing. Panic disorder is improving." *Id.* at 378. Barker also found that Plaintiff's affect was less anxious and euthymic. *Id.* at 377. During Plaintiff's visit on October 21, 2015, Barker's assessment was "anxiety is ongoing. ADHD is improving. Mood swings are ongoing." *Id.* at 518. And, after Plaintiff's treatment session on May 27, 2015, Barker's assessment was "anxiety is improving and ongoing. ADHD is ongoing. Mood swings are ongoing. Panic disorder is ongoing." *Id.* at 544. Plaintiff also reported that she felt "a little more self-control" with increases in Lamictal and was able to walk away when her anger increased. *Id.* at 543. However, Plaintiff also reported that her anxiety continued to increase and that she still became anxious when she went out in public. *Id.*

On the other hand, Barker has also assessed Plaintiff's conditions as increased and related to situational stressors during at least three treatment sessions. For example, Plaintiff consistently reported worries related to her grandmother's health, her relationship with her daughter's father, and her hearing for disability. *Id.* at 368; 520; 536. On October 7, 2013, Barker's assessment was

"anxiety is increased and related to situational stressors. ADHD is ongoing. Bipolar is increased and related to situational stressors. Panic disorder is improved." *Id.* at 369. Though Barker noted that her anxiety had increased, Plaintiff reported that Klonopin was effective against anxiety and she was taking it daily. *Id.* at 368-69.

After Plaintiff's visit on September 21, 2014, Barker's assessment was "anxiety is increased. ADHD is improving. Mood swings are ongoing. Panic disorder is ongoing." *Id.* at 521. Plaintiff, however, stated that Xanax was effective against increases in anxiety and reported that she ran out of it. *Id.* at 520. Finally, after Plaintiff's visit on July 1, 2015, Barker's assessment was "anxiety is ongoing. ADHD is increased. Mood swings are improving. Panic disorder is ongoing." *Id.* at 537. Plaintiff reported that anxiety continued to be high and felt Valium was ineffective against anxiety. *Id.* at 536. However, Plaintiff also stated that she thought the medication was "helping" and that her mood was less labile with Lamictal. *Id.*

### *Licensed Clinical Social Worker Delia Goldberg*

Delia Goldberg, a Licensed Mental Health Counselor, treated Plaintiff at Synergy between January 2015 and September 2015. *See* R. at 523-525; 530-534; 539-542; 549-550; 675-677. However, five out of seven Plaintiff's psychotherapy sessions by Goldberg contained incomplete entries and no assessment of Plaintiff's conditions. *Id.* at 533-534; 539-542; 549-550; 675-677. On Plaintiff's visit on July 14, 2015, Goldberg's assessment was "bipolar illness is ongoing." *Id.* at 531. On September 17, 2015, Goldberg's assessment was "anxiety is increased. Depression is exacerbated and related to situational stressors." *Id.* at 524.

Goldberg completed a mental impairment questionnaire on January 26, 2016. *Id.* at 805-813. In a chart regarding Plaintiff's mental abilities and aptitudes needed to do unskilled work, Goldberg identified several areas in which Plaintiff had no useful ability to function. *Id.* at 808.

For example, Goldberg noted that Plaintiff could not complete a normal workday and workweek without interruptions from psychological based symptoms; could not perform at a consistent pace without an unreasonable number and length of rest periods; could not accept instructions and respond appropriately to criticism from supervisors; could not deal with normal work stress; could not understand and remember detailed instructions; could not carry out detailed instructions; and could not deal with the stress of semiskilled and skilled work. *Id.* at 808-809.

Goldberg also reported that Plaintiff has marked limitations in activities of daily living and extreme limitations in maintaining social functioning or maintaining concentration, persistence or pace. *Id* at 810. Goldberg further noted that Plaintiff had missed several therapy appointments due to forgetfulness and had a composite IQ of 76. *Id.* at 809. In the same questionnaire, however, Goldberg stated that Plaintiff had a Global Assessment of Functioning (GAF) of 65 and opined that Plaintiff could manage benefits in her own interest. *Id.* at 806, 811. [3]

### Sullivan County Department of Community Services (SCDCS)

On October 26, 2015, Plaintiff sought a mental health evaluation from SCDCS in support of her disability application. *Id* at 814-823. Karen Verni[4] conducted a biopsychosocial assessment and diagnosed Plaintiff with panic disorder, hypertension, and asthma. *Id.* at 815. In evaluating Plaintiff's mental status, Verni noted that Plaintiff was well oriented in all spheres and appeared calm with appropriate affect, euthymic mood, animated speech, normal memory and

---

[3] A GAF of 51 to 60 suggests moderate symptoms that present a moderate difficulty in social, occupational, or school functioning, while a GAF of 61 to 70 suggests mild symptoms. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 27, 34 (4th ed. Text rev. 2000). Since the issuance of the Diagnostic and Statistical Manual of Mental Disorders Fifth Edition in 2013, courts have treated GAF scores as opinion evidence that are not probative of the severity requirements contained in the regulations unless the scores are supported by the available clinical evidence. *See, e.g., Mainella v. Colvin*, No. 13-cv-2453, 2014 WL 183957, at *5 (E.D.N.Y. Jan. 14, 2014).

[4] Though not stated expressly, the record suggests that Karen Verni is a social worker.

concentration, intact insight and good judgment, ability to attend and maintain focus and normal impulse control. *Id.*

On November 25, 2015, Verni prepared a mental health treatment plan, cosigned by Quazi Al Tariq, M.D. *Id* at 828-836. It noted that Plaintiff was unable to be accurately assessed as she never returned for follow-up session. *Id.* at 829. Treatment plan was individual and group therapy weekly, and medication management monthly. *Id.*

On December 11, 2015, Plaintiff underwent a psychiatric assessment with Nambi Saigunan, M.D. at SCDCS. *Id.* at 824-827. Plaintiff was diagnosed with Panic Disorder, Personality Disorder, and Adjustment Disorder. *Id.* at 826. Plaintiff stated that she was going to her best friend's baby shower by herself, which was expected to last for four hours, and "does not mind people around her for the party because it was her obligation." *Id.* On January 25, 2016, a SCDCS quarterly treatment plan indicated that Plaintiff met with psychiatrist and therapist twice during the past quarter. *Id.* at 838. As to her mental status, Plaintiff received similar assessments as on October 26, 2015 except that her mood was anxious. *Id.* at 840.

### iii. Plaintiff's Non-Psychiatric Treatment after Alleged Disability Date

From November 2012 to September 2015, Plaintiff received her non-psychiatric treatment at HRHcare. *Id* at 386-441; 556-674; 681-804. During that time period, medical experts noted Plaintiff's morbid obesity, tobacco abuse, intermittent asthma, hypertension, and menorrhagia. *Id.* Throughout the relevant period, HRHcare's doctors have repeatedly noted Plaintiff's intermittent asthma as well controlled. *Id.* at 390; 594; 681; 686. HRHcare's doctors also counseled Plaintiff on a weight management plan including recommendations on exercise and diet. *Id.* Plaintiff had never reported any functional limitation on account of her obesity and

asthma to HRHcar's doctors and HRHcare's doctors did not otherwise place any restrictions on Plaintiff's physical activities. *Id.*

### iv. Consulting Medical Experts

*Richard Goccia M.D.*

On February 25, 2014, Dr. Richard Goccia conducted an internal medicine examination. *Id.* at 444-51. Dr. Goccia reported that Plaintiff had a normal gait without using an assistive device, could walk on heels and toes without difficulty, could perform a full squat, could change for the exam without assistance, could get on and off the exam table without assistance, and could rise from a chair without difficulty. *Id* at 445. Dr. Goccia also reported that Plaintiff had full range of motion with normal reflexes, sensation, and strength, and without joint instability, tenderness or muscle atrophy. *Id.* at 446. Dr. Goccia concluded that Plaintiff is without limitations, however, should be restricted from environments that are dusty or that contain noxious fumes. *Id.* at 447.

*Leslie Helprin, Ph.D.*

On February 25, 2014, Leslie Helprin, Ph.D. conducted a psychiatric evaluation. *Id.* at 452-56. Dr. Helprin found that Plaintiff was cooperative and had adequate social skills and overall presentation, adequate receptive and expressive language skills, coherent and goal-directed thought processes, restricted affect, neutral mood, mildly impaired memory, below-average cognitive functioning, and fair insight and judgment. *Id.* at 453-54. Dr. Helprin opined that Plaintiff "evidences no limitations in her ability to follow and understand simple directions and instructions;" has "mild limitations" in her ability to perform simple tasks independently, and to maintain attention and concentration; has "moderate limitations" in her ability to perform complex tasks independently, to make appropriate decisions with regards to interactions with

others, and to deal appropriately with stress; but, has "marked limitations" in her ability to

maintain a regular schedule. *Id.* at 455. Dr. Helprin concluded that the results of the examination

appeared consistent with psychiatric problems and may significantly interfere with Plaintiff's

ability to function on a daily basis. *Id.*

### State Agent Medical Consultant T. Bruni

Based on a record review, State Agency Medical Consultant Dr. T. Bruni conducted a

mental residual functional capacity assessment on March 3, 2014. *Id.* at 73-83.[5] Dr. Bruni made

several findings. He determined, for example, that Plaintiff has moderate limitations in (1) her

ability to understand, remember and carry out detailed instructions; (2) complete a normal

workday and workweek without interruptions from psychologically-based symptoms and

perform at a consistent pace; (3) interact appropriately with the general public, get along with

coworkers, maintain socially appropriate behavior, and adhere to basic standards of neatness and

cleanliness; (4) respond appropriately to changes in the work setting; and (5) set realistic goals or

make plans independently of others. *Id.* at 79-81.

Dr. Bruni also found, however, that Plaintiff was not significantly limited in

understanding, remembering and carrying out very short and simple instructions; to perform

activities within a schedule, maintain regular attendance, and be punctual within customary

tolerance; to accept instructions and respond appropriately to criticism from supervisors; and had

one or two episodes of decompensation of extended duration. *Id.* Dr. Bruni concluded that

Plaintiff was able to follow and understand simple directions and instructions and could do work

despite obvious psychiatric limitations. *Id.* at 81.

---

[5] The record does not provide Dr. Bruni's first name.

*Vocational Expert Robert E. Breslin*

Robert E. Breslin testified as a Vocational Expert ("VE"). The ALJ described two hypothetical persons with different limitations to Breslin, who was then asked to determine whether there are four jobs in the national economy these persons could perform. The ALJ's first hypothetical assumed an individual with the same age, education and work history as Plaintiff, with the residual function capacity ("RFC") to engage in a full range of light work, with the following additional limitations: the person could understand, remember and carry out simple work; adapt to routine workplace changes; occasionally interact with supervisors, co-workers and the general public; and must avoid concentrated exposure to dust, fumes and noxious gas. *Id.* at 66-67. The VE testified that Plaintiff could be a housekeeper, a folder, a machine tender, or a storage facility clerk. *Id* at 67. The ALJ's second hypothetical asked the VE to assume additional limitations of missing work two days per month and being off-task 20% of the workday. The VE testified that these limitations would be work preclusive. *Id.* at 68.

### D. Additional Medical Evidence Submitted to Appeals Council Subsequent to the ALJ's Decision

#### i. Synergy of Monticello, Inc. treatment records

Subsequent to the ALJ's decision, Plaintiff submitted three additional sets of Synergy of Monticello treatment records. The Appeals Council did not consider the first set of records dated March 10, 2015 to October 21, 2015 on the basis that it was not new because it was a copy of Exhibits 8F and 9F. *Id.* at 2. The Appeals Council did not consider and exhibit the second set of records dated January 22, 2016 to February 10, 2016 after finding that this evidence did not show a reasonable probability that it would change the outcome of the decision. *Id.* Finally, the Appeals Council did not consider the last set of records dated April 6, 2016 to January 13, 2017 on the basis that this additional evidence did not relate to the period at issue and thus did not

affect the decision about whether Plaintiff was disabled beginning on or before March 8, 2016. *Id* at 2.

## LEGAL STANDARD

### I. Judicial Review of the Commissioner's Determination

A district court reviews a Commissioner's final decision under 42 U.S.C. §§ 405(g) and 1383(c)(3) to determine whether there is substantial evidence supporting the Commissioner's decision and whether the Commissioner applied the correct legal standard. *Talavera v. Astue*, 697 F.3d 145, 151 (2d Cir. 2012). "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation marks omitted).

The substantial evidence standard means that once an ALJ finds facts, a district court can reject those facts "only if a reasonable factfinder would have to conclude otherwise." *Brault v. SSA*, 683 F.3d 443, 448 (2d Cir. 2012) (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)). In other words, this Court must afford the Commissioner's determination considerable deference, and may not "substitute its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review." *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991) (internal quotation marks and citation omitted).

### II. Commissioner's Determination of Disability

#### A. Definition of Disability

A disability, as defined by the Social Security Act, is one that renders a person unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A)

*accord* 42 U.S.C. § 1382c(a)(3)(A). Further, "[t]he impairment must be 'of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.'" *Shaw v. Chater*, 221 F.3d 126, 131-32 (2d Cir. 2000) (quoting 42 U.S.C. § 423(d)(2)(A)).

**B.      The Commissioner's Five-Step Analysis of Disability Claims**

The Commissioner uses a five-step process to determine whether a claimant has a disability within the meaning of the Social Security Act. *Curry v. Apfel*, 209 F.3d 117, 122 (2d Cir. 2000); *see* 20 C.F.R. §§ 404.1520(a)(4). First, the Commissioner determines whether the claimant is employed. *Curry*, 209 F.3d at 122. Second, if the claimant is unemployed, the Commissioner considers whether the claimant has a "severe impairment" that "significantly limits his physical or mental ability to do basic work activities." *Id.* Third, if the claimant suffers from such an impairment, the Commissioner determines whether that impairment meets or medically equals the criteria of a listed impairment in Appendix 1 of the Social Security Act regulations, meaning it conclusively requires a determination of disability. *Id.*; *see also* 20 C.F.R., Part 404, Subpart P, App'x 1. If the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, she has the residual functional capacity ("RFC") to perform her past work. *Curry*, 209 F.3d at 122. Finally, if the claimant is unable to perform his past work, the Commissioner determines whether there is other work which the claimant could perform. *Id.*

"The claimant has the general burden of proving that he or she has a disability within the meaning of the Act, and 'bears the burden of proving his or her case at steps one through four.'" *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (internal citations omitted). At step five,

however, "the burden shifts to the Commissioner to show that there [are] a significant number of jobs in the national economy that [the claimant] could perform based on his residual functional capacity, age, education, and prior vocational experience." *Butts v. Barnhart*, 388 F.3d 377, 381 (2d Cir. 2004) (citing 20 C.F.R. § 404.1560).

### i. Special Technique in Mental Health Cases

In addition to this five-step process, when evaluating "the severity of mental impairments," the ALJ must apply a "special technique" during steps two and three. *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008) (citations omitted). This technique "requires the reviewing authority to determine first whether the claimant has a 'medically determinable mental impairment.'" *Id.* at 265-66. If the claimant "is found to have such an impairment, the reviewing authority must 'rate the degree of functional limitation resulting from the impairment(s)'" in "four broad functional areas: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation." *Id.* at 266 (citing 20 C.F.R. § 404.1520a). Paragraph B of each Medical Listing "sets forth the minimum necessary finding for that particular impairment in each of the four § 404.1520a functional areas." *Fait v. Astrue*, No. 10-5407, 2012 WL 2449939, at *5 (E.D.N.Y. June 27, 2012).

Under the regulations, "if the degree of limitation in each of the first three areas is rated 'mild' or better, and no episodes of decompensation are identified, then the reviewing authority generally will conclude that the claimant's mental impairment is not 'severe' and will deny benefits." *Kohler*, 546 F.3d at 266. If the mental impairment is determined to be "severe," then the ALJ will "compare the relevant medical findings and the functional limitation ratings to the

criteria of listed mental disorders in order to determine whether the impairment meets or is equivalent in severity to any listed mental disorder." *Id.*

"Importantly, the regulations require application of this process to be documented." *Id.* (citing 20 C.F.R. § 404.1520a (e)). The ALJ's written decision must "reflect application of the technique," and it "*must* include a specific finding as to the degree of limitation in each of the functional areas" described above. *Id.*

## THE ALJ'S DECISION

First, the ALJ concluded that Plaintiff has not engaged in substantial gainful activity since November 4, 2013, the application date. *See* R. at 13.

Second, the ALJ concluded that Plaintiff has the following severe impairments: obesity; depressive disorder; anxiety disorder; panic disorder; asthma; and ADHD because they each impose more than slight limitations on her physical and mental ability to perform basic work activities. *Id.* The ALJ also found that Plaintiff has a BMI of 46. *Id.*

Third, the ALJ concluded that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of Listed Impairments 3.03, 12.04 and 12.06 in 20 CFR Part 404, Subpart P, Appendix 1. *Id.* at 13-14. The ALJ determined that listing 3.03 was not satisfied because Plaintiff did not have chronic asthmatic bronchitis or attacks that require physician intervention occurring at least once every two months in spite of prescribed treatment. *Id.* The ALJ determined that the "paragraph B" criteria was not satisfied because Plaintiff has only "mild" restriction in daily living; "moderate" difficulty in social functioning and concentration, persistence or pace; and suffered no episodes of decompensation of extended duration. *Id.* Further, the ALJ found that the medical evidence of record fails to establish the presence of the "paragraph C" criteria, as the record did "not indicate repeated episodes of

decompensation, a residual disease process resulting in marginal adjustment, or a history of one or more years' inability to function outside a highly supportive living arrangement." *Id.* at 14.

Fourth, the ALJ determined that Plaintiff has the residual functional capacity ("RFC") to perform light work as defined in 20 CFR 416.967(b). The ALJ also found that Plaintiff is able to understand, remember, and carry out simple work and adapt to routine workplace changes, and can occasionally interact with supervisors, coworkers, and the general public, and must avoid concentrated exposure to dust, fumes, and noxious gases. *Id.* at 14-19. The ALJ first determined that Plaintiff would be limited to light exertional work and should avoid concentrated exposure to dust, fumes and noxious gases based on Plaintiff's obesity in combination with her other impairments pursuant to the requirements of SSR 02-1p. *Id.* at 16. The ALJ further determined that substantial evidence from the various provider treatment notes support that Plaintiff does not have any marked limitations in her mental health functioning and that Plaintiff can engage in unskilled work and can occasionally interact with others. *Id.* at 16.

Fifth, having found that Plaintiff has no past relevant work, is a younger individual under 20 CFR 416.963, has a limited education, and is able to communicate in English and considering Plaintiff's age, education, work experience, and residual functional capacity, the ALJ determined that there are jobs that exist in significant numbers in the national economy that the claimant can perform. *Id.* at 19. In this determination, the ALJ relied on the testimony of Vocational Expert Robert E. Breslin to conclude that Plaintiff could engage in a full range of light and unskilled work including working as a housekeeper, a folder, a machine tender or a storage facility clerk. *Id.* at 20.

# DISCUSSION

## I. Application of Special Technique

Although Plaintiff did not raise the ALJ's compliance with the "special technique" for mental impairments, this Court addresses the issue *sua sponte*. The ALJ did not cite to 20 C.F.R. § 404.1520a or state on the record that he followed the special technique. After examining the record, the Court holds that the ALJ made the necessary findings.

At step two, the ALJ found that Plaintiff had obesity, depressive disorder, anxiety disorder, panic disorder, asthma and ADHD and that these impairments are severe. R. at 13. Thus, the ALJ proceeded to step three, where he determined that the impairments did not meet or medically equal the Medical Listings. Although the ALJ did not specifically state that he was following the special technique, he outlined the four functional areas based on the paragraph B criteria under Medical Listing 12.04 and 12.06, discussed his review of the psychiatric treatment notes and other evidence in the record, and made specific conclusions with respect to each category. R. at 14.

The ALJ should have expressly articulated that he was applying the special technique in this case. This case need not be remanded, however, because the ALJ "evaluated each of the four functional areas" and "record[ed] specific findings as to [Plaintiff's] degree of limitation" in each of these areas. *Cf. Kohler*, 546 F.3d at 267 (remanding where ALJ did not follow special technique or make specific findings on the record); *see Comins v. Astrue*, 374 Fed. App'x 147, 149 (2d Cir. 2010) (affirming where "the ALJ's decision specifically expounded upon each of the four functional areas of the special technique.").

## II.    The ALJ Properly Developed the Record

Plaintiff contends that the ALJ failed to properly develop the record because he failed

seek clarification from Plaintiff's non-psychiatric treatment providers, treating nurse practitioner

and licensed clinical social worker or request additional records. Pl.'s Mem. Supp. Mot. J.

Pleadings ("Pl. Br.") 16-17, ECF No. 13. "Because a hearing on disability benefits is a non-

adversarial proceeding, the ALJ generally has an affirmative obligation to develop the

administrative record." *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996). The record must be

"complete and detailed enough to allow the ALJ to determine the claimant's residual functional

capacity." *Roman v. Colvin*, No. 15CIV4800LGSJCF, 2016 WL 4990260, at *7 (S.D.N.Y. Aug.

2, 2016), *report and recommendation adopted*, No. 15CIV4800LGSJCF, 2016 WL 4919960

(S.D.N.Y. Sept. 14, 2016) (citing 20 C.F.R. § 416.913(e)) (citing Social Security Ruling ("SSR")

96-8p, 1996 WL 374184, at *5 (July 2, 1996)).

Though an ALJ must make reasonable efforts to aid an applicant in retrieving medical

reports from her medical sources, and to collect any other necessary evidence, *Villarreal v.

Colvin*, No. 13 Civ. 6253, 2015 WL 6759503, at *17 (S.D.N.Y. Nov. 5, 2015) (quoting 20 C.F.R.

§416.913(e)), "an ALJ is not required to attempt to obtain additional evidence to fill any gap in

the medical evidence; rather an ALJ is required to do so only where the facts of the particular

case suggest that further development is necessary to evaluate the claimant's condition fairly."

*Francisco v. Commissioner of Social Security*, No. 13 Civ. 1486, 2015 WL 5316353, at *11

(S.D.N.Y. Sept. 11, 2015) (citing *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 32 (2d

Cir.2013)).

Here, the ALJ fulfilled his responsibility to ensure Plaintiff had the records from her

medical sources. The voluminous medical record assembled by the claimant's counsel contained

extensive evidence of both non-psychiatric treatment and psychiatric treatment for the relevant period. At the hearing, the ALJ made several inquiries to Plaintiff's counsel to ensure that the subpoenaed medical evidence was in the record and that the record was complete and up to date. *Id.* at 37-38. Plaintiff confirmed to the ALJ that the medical records were complete. *Id.* Therefore, Plaintiff's argument that the ALJ should have requested additional records is unavailing.

Plaintiff, however, argues that the ALJ should have further developed the record by seeking clarification of medical statements regarding how Plaintiff's weight might impact her asthma and, as a result, her work capability. Pl. Br. 16-17, ECF No. 13. This argument is without basis. "[W]here the medical evidence shows relatively minor physical impairment, an ALJ permissibly can render a common sense judgment about functional capacity even without a physician's assessment." *Wilson v. Colvin*, No. 13-CV-6286P, 2015 WL 1003933, at *21 (W.D.N.Y. Mar. 6, 2015) (quotation omitted); *Santillo v. Colvin*, No. 1:13-cv-8874-GHW, 2015 WL 1809101, at *10 (S.D.N.Y. Apr. 20, 2015) (same).

In the instant case, the ALJ specifically considered Plaintiff's obesity in combination with her other impairments and correctly found that Plaintiff's RFC would be limited to light exertional work. R. at 16. Indeed, Plaintiff's healthcare providers never placed restrictions on Plaintiff's physical activity due to her obesity and asthma; rather they encouraged her to diet and exercise. *Id.* at 556-597. Furthermore, Dr. Goccia's examination, Dr. Bruni's findings and Plaintiff's own medical records supported the conclusion that Plaintiff's asthma was mild and well controlled and that her hypertension was well controlled. *Id.* at 78; 390; 444; 594; 681; 686. Accordingly, nothing in the record, including Plaintiff's obesity, asthma and hypertension, prevented her from performing the physical demands of light work.

Next, Plaintiff argues that the ALJ should have developed the record by requesting clarification of Plaintiff's impairments from Plaintiff's treating nurse-practitioner (NP) Beth Barker and licensed clinical social worker Delia Goldberg. Pl. Br. 17-18, ECF No. 13. At the time Plaintiff's complaint was filed, social workers and nurse practitioners were not considered "acceptable medical sources" under the prevailing regulations. *Pilaccio v. Comm'r of Social Security Administration*, No. 16-1251, 2017 WL 2789023, at *3 (E.D.N.Y. June 26, 2017) (citing 20 C.F.R. § 404.1527(a)(2)).[6] The ALJ, however, was permitted to "use evidence from 'other sources,'" including nurse practitioners and licensed clinical social workers. SSR 06-03p, 2006 WL 2329939, at *2 (S.S.A. Aug. 9, 2006) (emphasis added). Opinions from "other sources" should be evaluated based on "the same factors for the evaluation of the opinions of 'acceptable medical sources.'" *Canales v. Comm'r of Social Sec.*, 698 F. Supp. 2d 335, 344 (E.D.N.Y. 2010) (citing SSR 06-03p at *4). Accordingly, while an ALJ is "free to conclude" that the opinions of social workers or nurse practitioners are "not entitled to any weight," the ALJ must "explain that decision." *Id.* The ALJ did so here.

As is reflected in the record, the ALJ did in fact consider and accord some weight to NP Barker's opinions. The ALJ made several specific references to Barker's treatment notes on Plaintiff's mental status examination that showed that Plaintiff's mental status examination results had been consistently normal. *R.* at 15-16. The ALJ also noted treatment records that indicated improvements in Plaintiff's impairments from taking medications. The ALJ was entitled to afford less weight to Barker's assessments that Plaintiff's mental impairments were

---

[6] The Supreme Court has held that "administrative rules will not be construed to have retroactive effect unless their language requires it." *Bowen v. Georgetown Univ. Hosp.*, 109 S.Ct. 468, 471 (1988). Recent revisions to the SSA regulations treat advanced practice registered nurses as "acceptable medical sources", but "only with respect to claims filed on or after March 27, 2017." 20 C.F.R. § 404.1502(a)(7); *see Pilaccio*, 2017 WL 2789023, at *3. Since Plaintiff's claim was filed before March 27, 2017, this provision does not apply retroactively. Regardless, social workers are still not considered "acceptable medical sources." *See* 20 C.F.R. § 404.1502(a).

increased due to situational factors on multiple occasions because these assessments appeared to be solely based on Plaintiff's self-reported symptoms. *See Cruz v. Colvin*, 278 F. Supp. 3d 694, 699 (W.D.N.Y. 2017) (citing *Johnson v. Colvin*, 2015 WL 6738900 at *16 (E.D.N.Y. 2015), *aff'd sub nom. Johnson v. Comm'r of Soc. Sec.*, 669 Fed. Appx. 580 (2d Cir. 2016)).

Moreover, the record of Plaintiff's treatment with Barker was complete, thus the ALJ did not err by not seeking NP Barker's opinion. "It is well established in this Circuit that 'where there are no obvious gaps in the administrative record, and where the ALJ already possesses a 'complete medical history,' the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim." *Rosa v. Callahan*, 168 F.3d 72, at 79 n.5 (2d Cir. 1989) (quoting *Perez v. Chater*, 77 F.3d 41, 48 (2d Cir. 1996)). Here, the record is complete and contains NP Barker's treatment reports spanning from Plaintiff's initial visit to her last visit prior to Plaintiff "self-referring" to SCDCS for help with filing for disability. There is no suggestion of any gaps in the record or an incomplete assessment of Plaintiff's mental impairments. Plaintiff has not explained why the ALJ was under any obligation to contact Barker for her medical opinions in light of a complete record.

The ALJ also properly considered Goldberg's opinions and justified his decision to give little weight to these opinions. Plaintiff argues that the ALJ failed to analyze and to appropriately weigh Goldberg's notes and opinions. Pl. Br. 18, ECF No. 13. The ALJ, however, carefully enumerated and considered all of Goldberg's opinions on Plaintiff's impairments and ability to work, but gave little weight to Goldberg's opinions because they were inconsistent with NP Barker's treatment notes, Plaintiff's reported activities, and the opinions of Drs. Helprin and Bruni. *R.* at 18. Goldberg was not Plaintiff's treating physician, had only seen claimant on seven

occasions before the hearing, and five out of seven treatment reports by Goldberg were incomplete, which Plaintiff concedes. Pl. Br. 18, ECF No. 13.

Moreover, case law suggests that further development of a complete record is not necessary where there are merely inconsistencies or conflicting medical evidence. *See Micheli v. Astrue*, 501 F. App'x 26, 29 (2d Cir. 2012); *accord Brown v. Comm'r of Soc. Sec.*, 2014 WL 783565, at *17 (S.D.N.Y. Feb 28, 2014) ("Brown points to case law suggesting that an ALJ has a duty to develop the record where there are 'inconsistencies' in a treating physician's records. But we read these cases as directing further development of the record only where the record was incomplete.") (citations omitted). Goldberg was not a treating physician, and the record was complete as to Plaintiff's treating physicians. Thus, the ALJ, who clearly reviewed Goldberg's notes and questionnaire, properly explained his decision to accord little weight to Goldberg's opinion.

### III. The ALJ Properly Analyzed The Record.

Plaintiff further contends that the ALJ erred by (1) picking and choosing evidence that supported his RFC finding, and (2) by not considering claimant's documented non-exertional impairments in combination with each other. Pl. Br. 18-20, ECF No. 13. The Court disagrees. A review of the ALJ's conclusions were supported by Drs. Goccia, Helprin, and Bruni's findings as well as the overall record.

The Second Circuit has held that "[a]lthough the ALJ is not required to reconcile every ambiguity and inconsistency of medical testimony, he cannot pick and choose evidence that supports a particular conclusion. His failure to acknowledge relevant evidence or to explain its implicit rejection is plain error." *Smith v. Bowen*, 687 F. Supp. 902, 904–05 (S.D.N.Y. 1988) (citations omitted). As discussed above, the ALJ acknowledged the relevant evidence in the

record and clearly articulated why he chose to weigh certain pieces of evidence less favorably. The Plaintiff has not shown that the ALJ rejected relevant evidence without a reason, and his decision not to reference some pieces of evidence in his decision is not reversible error. *See Brault v. Soc. Sec. Admin., Com'r*, 683 F.3d 443, 448 (2d Cir. 2012) ("An ALJ does not have to state on the record every reason justifying a decision. Although required to develop the record fully and fairly, an ALJ is not required to discuss every piece of evidence submitted. . . . An ALJ's failure to cite specific evidence does not indicate that such evidence was not considered.") (citation omitted).

The ALJ also considered all of Plaintiff's impairments in combination with each other. At the outset, the ALJ properly found that Plaintiff's physical impairments did not meet or medically equal Medical Listings 3.03. *See* R. at 13. Under listing 3.03, the claimant must have chronic asthmatic bronchitis or attacks that require physician intervention occurring at least once every two months in spite of prescribed treatment. 20 C.F.R. Part 404, Subpt. P, Appx. 1, §3.03. As already noted, claimant's asthma was mild and well-controlled. The ALJ properly concluded that the record does not establish claimant's asthma to meet or medically equal listing 3.03.

Next, the ALJ properly found that Plaintiff's mental impairments, individually or combined, did not meet or medically equal Medical Listings 12.04 or 12.06.[7] *See* R. at 13-14. Listing 12.04, which covers depression, and Listing 12.06, which covers anxiety, requires that a claimant's impairments satisfy the requirements of paragraph A and the requirements of either paragraphs B or C. 20 C.F.R. Part 404, Subpt. P, Appx. 1, §§ 12.04, 12.06. To fulfill the requirements of paragraph B, the claimant must experience at least two of the following limitations: "marked restriction of activities of daily living;" "marked difficulties in maintaining

---

[7] The requirements for these Medical Listings are those that were effective during the relevant period of Plaintiff's application for SSI.

social functioning;" "marked difficulties in maintaining concentration, persistence, or pace;" or "repeated episodes of decompensation, each of extended duration." 20 C.F.R. Part 404, Subpt. P, Appx. 1, §12.04 (B).

Paragraph C requires: (1) repeated episodes of decompensation, each for extended duration; (2) a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or (3) a current history of one or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement. *Id.* at (C). Repeated episodes of decompensation, each of extended duration means three episodes within 1 year, or an average of once every 4 months, each lasting for at least two weeks. 20 C.F.R. Pt. 404, Subpt. P, Appx. 1 §§ 12.00(C) (4). The Listing 12.06 paragraph C criteria requires that the claimant's disorder result "in complete inability to function independently outside the area of one's home." *Id.* § 12.06(C).

Here, the ALJ found that Plaintiff had mild limitations in activities of daily living, moderate limitations in social functioning, moderate limitations in concentration, persistence or pace and no episodes of decompensation of extended duration. R. at 13-14. Accordingly, the ALJ concluded that Plaintiff failed to meet the paragraph B criteria. *Id.* The ALJ further found that paragraph C criteria was not met because the medical evidence of record does not show repeated episodes of decompensation, a residual disease process resulting in marginal adjustment, or a history of one or more years' inability to function outside of a highly supportive living arrangement. *Id.* at 14. There is substantial evidence to support this conclusion. For example, Plaintiff reported both in her Work History Report and to Dr. Goccia that she was able to perform personal hygiene, clean, do laundry, manage her own money, go shopping and travel

alone using public transportation. *Id.* at 260-263; 454-455. *See Colbert v. Comm'r of Soc. Sec.*, 313 F.Supp.3d 562 (S.D.N.Y. 2018) (evidence that the claimant could clean and do her own laundry, denied having problems getting along with other people, attended "group programming" and church, traveled independently on public transit, and shopped in stores supported a finding that claimant had no listed mental impairment).

Moreoever, the ALJ finding that Plaintiff had moderate limitations in social functioning was similarly supported by the record. Dr. Bruni determined that Plaintiff had moderate limitations in social functioning and Dr Helprin opined that Plaintiff was cooperative and had adequate social skills. *Id.* at 79-81; 453-454. The ALJ's findings are also consistent with Plaintiff's own reports that she socialized with friends and families, lived with friends, and attended her best friend's baby shower by herself and did not mind people around her. *Id.* at 445; 455; 826.

Finally, the ALJ's finding of moderate limitations in concentration, persistence or pace, after expressly giving Plaintiff the full benefit of the doubt, was consistent with the record. For instance, NP Barker's notes show consistently normal mental status examination results; Dr Helprin's findings show that Plaintiff has coherent and goal directed thought processes, mildly impaired attention and concentration, fair insight and fa ir judgment; and Dr. Bruni's findings show that Plaintiff has mild difficulties in maintaining concentration, persistence or pace, and has had only one or two episodes of decompensation. The ALJ further found that the record contained no indication that Plaintiff suffered any extended episodes of decompensation or that

Plaintiff was ever hospitalized psychiatrically. As such, the ALJ did not err in finding no episodes of decompensation of extended duration.[8]

## IV. Substantial Evidence Supports the ALJ's RFC Determination

The ALJ determined that Plaintiff had the RFC to perform the full range of light work, except that she had the following non-exertional limitations: she can understand, remember and carry out simple work and adapt to routine workplace changes, occasionally interact with supervisors, coworkers and the general public, and must avoid concentrated exposure to respiratory irritants. R. 14. Plaintiff, however, contends that "the ALJ did not account for [P]laintiff's proven panic attacks, poor ability to focus on tasks, poor frustration tolerance, poor impulse control, irritability and easy distractibility." Pl. Br. 22, ECF No. 13. The medical opinions from Drs. Goccia, Helprin, and Bruni, and Plaintiff's own testimony and treatment records, however, provide substantial evidence that support the ALJ's RFC finding of non-exertional limitations. *Diaz v. Shalala*, 59 F.3d 307, 315 (2d Cir. 1995) ("The opinions of three examining physicians, plaintiff's own testimony, and the medical tests together constitute substantial evidence.").

"When determining a claimant's RFC, the ALJ is required to take the claimant's reports of pain and other limitations into account," *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citing 20 C.F.R. § 416.929), "but [the ALJ] is not required to accept the claimant's subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record." *Id.* (citing *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir. 1979)). To evaluate a claimant's assertions of pain and other limitations,

---

[8] To the extent that Goldberg's opinions conflict with the findings, the ALJ was well within his authority to give little weight to Goldberg's opinions and this Court defers to the ALJ's resolution of conflicting evidence. *Clark v. Comm'r of Soc.Sec.*, 143 F. 3d 115, 118 (2d Cir. 1998).

the ALJ must follow a two-step process. "[A]t the first step, the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged," then, "[i]f the claimant does suffer from such an impairment, at the second step, the ALJ must consider the extent to which the claimant's symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence of record." *Id.* (citing 20 C.F.R. §404.1529(a)). In particular, "the ALJ must consider statements the claimant or others make about his impairments, his restrictions, his daily activities, his efforts to work, or any other relevant statements he makes to medical sources during the course of examination or treatment, or to the agency during interviews, on applications, in letters, and in testimony in its administrative proceedings." *Id.* (citations and internal quotation marks omitted); *see also* 20 C.F.R. § 416.929(c); SSR 96-4p.

"It is the function of the Commissioner, not the reviewing courts, to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." *Calabrese v. Astrue*, 358 Fed. Appx. 274, 277 (2d Cir. 2009). "[A]n ALJ's credibility determination is generally entitled to deference on appeal." *Selian v. Astrue*, 708 F. 3d 409, 420 (2d Cir. 2013). And, "where the ALJ's decision to discredit a claimant's subjective complaints is supported by substantial evidence, [the reviewing courts] must defer to his findings." *Calabrese*, 358 Fed.Appx. at 277.

Here, the ALJ applied the two-step framework and determined that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." R. at 15. Plaintiff does not dispute this determination, but the Court addresses this issue *sua sponte*. In making this decision, the ALJ relied on factors

described 20 C.F.R. §416.929(C) and SSR 96-4p and SSR 96-7p.[9] The ALJ found that while Plaintiff's treatment records indicate some complaints, clinical findings do not support the degree of limitations alleged. R. at 15. The ALJ further found that Plaintiff's reported daily activities and medical treatment similarly do not reflect the degree of limitations alleged. *Id*. at 19.

The Court finds that the ALJ's credibility determination is supported by substantial evidence in the record and that the ALJ properly considered Plaintiff's daily activities. For example, Plaintiff has never been hospitalized, and regularly received medications and routine consultative treatment on the basis of her mental impairments. *Id*. at 352-385; 442; 517-522; 526-529; 535-538; 543-548; 551-553; 677-680. Plaintiff's mental status examinations were also consistently normal or nearly normal. *Id*. On multiple occasions, Plaintiff reported not needing to take and intentionally not taking medication for her attention and concentration. *Id*. at 375; 377; 517-518; 520; 526; 543-544; 677. Plaintiff reported both in her Work History Report and to Dr. Goccia that she was able to perform personal hygiene, clean, do laundry, manage her own money, go shopping and travel alone using public transportation. *Id*. at 260-263; 454-455. Plaintiff also reported that she cared for her one-year-old daughter and reported that she attended a baby shower on Long Island. *Id*. at 824-827.

The ALJ's determination that Plaintiff could understand, remember and carry out simple work and adapt to routine workplace changes is supported by Dr. Helprin's findings that Plaintiff had no limitations in her ability to follow and understand simple directions and instructions, and had only mild limitations in her ability to perform simple tasks independently and to maintain attention and concentration. The ALJ properly explained his decision to give little weight to Dr.

---

[9] SSR 96-4p was superseded by SSR 16-3p effective March 28, 2016. At the time Plaintiff's application was filed, SSR 96-4p was still in force.

Helprin's finding that Plaintiff has a marked limitation to her ability to maintain a regular schedule on the basis that Plaintiff's treatment records from Synergy showed consistently normal mental status examinations and her ability to consistently care for her child. R. at 17. Dr. Bruni's opinion based on a review of Plaintiff's medical record that Plaintiff is not significantly limited in her ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerance further supports the ALJ's decision.

Next, the ALJ's determination that Plaintiff could only occasionally interact with supervisors, coworkers and the general public is supported by substantial evidence. Specifically, Dr. Helprin's findings and Dr. Bruni's opinions that Plaintiff has only moderate limitations in her ability to interact appropriately with the public, complete a normal workday and workweek without interruption, maintain attention and concentration for extended periods, and deal appropriately with stress due to anxiety. The Second Circuit has repeatedly held that "moderate" limitations do not preclude an individual's ability to perform unskilled work. *See, e.g., McIntyre v. Colvin*, 758 F.3d 146, 149 (2d Cir. 2014) (no error where ALJ found plaintiff was capable of work despite "moderate difficulties" in social functioning and concentration, persistence or pace); *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) (holding that "although there was some conflicting medical evidence, the ALJ's determination that Petitioner could perform her previous unskilled work was well supported" where the reports of treating psychiatrist and consulting doctors indicated the plaintiff was "depressive, without psychotic features other than occasional self-reported hallucination, and that her condition improved with medication" and had nothing "more than moderate limitations in her work-related functioning . . . ."); *Matta v. Astrue*, 508 Fed. Appx. 53, 55 (2d Cir. 2013) (affirming decision where "[t]he ALJ found that plaintiff had moderate difficulties in concentration, persistence and pace and moderate difficulties in

social functioning that limit [him] to simple, routine, low-stress, and unskilled tasks, which involve no more than minimal contact with co-workers, supervisors and the general public."); *Whipple v. Astrue*, 479 Fed. Appx 367, 370 (2d Cir. 2012) (holding that consultative examiners' findings that the plaintiff's depression caused moderate limitations in social functioning ultimately supported the ALJ's determination that Plaintiff was capable of performing work that involved simple tasks and allowed for a low-stress environment).

Furthermore, during Plaintiff's visit to Synergy on October 28, 2013, Plaintiff reported that "she was looking for jobs and had put in several applications." *Id.* at 358. Therefore, the ALJ's RFC finding of non-exertional limitations was supported by both Dr. Helprin and Dr. Bruni's opinions. Indeed, "[i]t is well-settled that a consulting physician's opinion can constitute substantial evidence supporting an ALJ's conclusions." *Rivera v. Colvin*, No. 15-3587, 2015 WL 9591539, at *16 (S.D.N.Y. Dec. 18, 2015) (collecting cases). Crucially, Dr. Helprin not only evaluated Plaintiff's medical records, but also evaluated Plaintiff.

As for the physical RFC finding, the ALJ found that Plaintiff had the RFC to perform light work, but must avoid concentrated exposure to dust, fumes and noxious gases. In making this finding, the ALJ noted Dr. Goccia's clinical findings on examination, including a pulmonary function test, which found no abnormalities in plaintiff's musculoskeletal system or chest and lungs except for mild asthma. R. at 17; 445-446. The ALJ credited Dr. Goccia's opinion that Plaintiff, despite her noted obesity, had no physical limitations for working except the need to avoid exposure to respiratory irritants. *Id.* As discussed above, Plaintiff's medical record also supports this conclusion. Plaintiff self-reported in her Work Function Report that she walked, stood or handled big objects as much as eight hours each day in her previous job as a cashier at

Walmart. *Id.* at 253.[10] Plaintiff also reported that she frequently carried items weighing less than 10 pounds and had carried as much as 50 pounds. *Id.* Plaintiff's reported activities in daily livings, including raising her one-year-old child, performing household chores, going shopping and traveling alone and using public transportation are consistent with an RFC finding of performing light work. *See e.g., id.* at 445.

## V. Substantial Evidence Supported the ALJ's Determination That Plaintiff Was Able to Perform Work That Exists in the National Economy

Finally, Plaintiff contends that the hypotheticals posed by the ALJ to the VE, like his RFC finding, failed to properly account for Plaintiff's impairments. Pl. Br. 22, ECF No. 13. As held above, however, the ALJ's RFC determination is supported by substantial evidence and properly reflects Plaintiff's limitations. Thus, the Court disagrees and holds that substantial evidence supported the ALJ's finding at step five that Plaintiff could perform other jobs existing in significant numbers in the national economy. R. at 19-20.

The ALJ had presented a hypothetical to the VE that reflected the limitations included in the ALJ's RFC assessment, and the VE identified four light, unskilled jobs that plaintiff could perform. *Id.* at 66-67. Plaintiff's argument, which relies on Dr. Helprin's findings and Dr. Bruni's opinions, is that the ALJ improperly discarded the VE's testimony that additional limitations including missing two days of work a month and being off task 20 percent of the workday would be work preclusive. Pl. Br. 22, ECF No. 13. As discussed above, however, the ALJ properly gave little weight to Dr. Helprin's finding that Plaintiff has a marked limitation in

---

[10] Light work "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. The full range of light work requires standing or walking, off and on, for a total of approximately six hours of an eight-hour workday. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities." 20 C.F.R. § 416.967.

maintaining regular schedule. Contrary to Plaintiff's argument, Dr. Bruni opined that Plaintiff is not significantly limited in her ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerance.

Where substantial evidence supports the ALJ's RFC determination, the ALJ may properly rely on the VE's testimony in finding that jobs exist in the national economy that Plaintiff could perform. Substantial evidence therefore supports the ALJ's finding that Plaintiff was not disabled. *See generally Fuller v. Shalala*, 898 F. Supp. 212, 218 (S.D.N.Y. 1995) (holding that where the record leads to the conclusion that the plaintiff retains the capacity to perform a full range of sedentary jobs, "the ALJ was not required to adduce the testimony of the vocational expert."). The ALJ properly relied on the VE's assessment to determine that Plaintiff could work as a housekeeper, a folder, a machine tender and a storage facility clerk and that these jobs existed in significant numbers in the nation. R. at 20.

## CONCLUSION

For the reasons state above, Plaintiff's Motion for Judgment on the Pleadings is **DENIED**; Defendant's cross-motion is **GRANTED**.

**SO ORDERED.**

**Dated: September 27, 2018**
      **New York, New York**

                                    **ANDREW L. CARTER, JR.**
                                    **United States District Judge**